1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANCE A. ELIAS,

          Petitioner,

  v.

TONY LAMARQUE, Warden,

          Respondent.

_____/

No. C 04-2537 MMC (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     Petitioner France A. Elias ("petitioner"), a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  After reviewing the petition, the Court ordered respondent Tony LaMarque ("respondent") to show cause why the petition should not be granted based on petitioner's cognizable claims. Respondent has filed an answer, accompanied by a memorandum and exhibits, contending that the petition should be denied.  Petitioner has filed a traverse.

<b>PROCEDURAL BACKGROUND</b>

     A jury in Santa Clara County Superior Court found petitioner guilty of second degree robbery with personal use of a firearm.  The Superior Court sentenced petitioner to twelve years in state prison, inclusive of ten years for the firearm enhancement.  The California Court of Appeal affirmed the conviction and sentence, and the California Supreme Court denied the petition for review.

//

1

## FACTUAL BACKGROUND

2

The California Court of Appeal provided the following summary of the facts of the case:

3

Edwin Lin owned the ECL market.  Mr. Lin also ran a check cashing service in the market.  Lin made and kept an identification card that contained a photograph, address, fingerprint and signature for each check cashing customer.  This card indicated the dates upon which they cashed checks.

4

5

At approximately 8:00 p.m. on December 19, 2000, Carlos Ramirez and the defendant entered the ECL Market.  Ramirez joined Lin behind the counter while the defendant pointed a gun at Mr. Lin.  The two men ordered Mr. Lin to put money in a bag, but he refused.  Ramirez grabbed money from the open register and stuffed it into his pockets.  He then jumped back over the counter and ran out of the store with the defendant, dropping some of the money.

6

7

8

Each of the men wore black and had pantyhose pulled over their faces. The defendant wore a beanie hat.  Mr. Lin recognized Ramirez as a frequent check cashing customer.  Mr. Lin did not recognize the defendant, but was able to see him clearly during the robbery, and was sure of his identification of the defendant as the robber.  According to Mr. Lin's calculation, the duo stole $1996.

9

10

11

Jerry Marsh and Diana Gesner testified that while they sat in Marsh's car in a parking lot at 8:00 p.m., two men approached the ECL Market.  The men wore black clothing and hoods.  Marsh believed one man had a beanie hat on under his hood.  A few minutes later, the same two men ran away from the store and drove away in a dark colored truck.  Each man appeared to be carrying something under his shirt.  It was too dark outside to see either of their faces.  After the men left, Marsh and Gesner went inside the market to see what had happened.  There was money strewn on the floor behind the counter and Mr. Lin said he had just been robbed.

12

13

14

15

16

Officer Chris Pilger responded to a dispatch regarding the robbery. Mr. Lin gave Ramirez's identification card with a photograph and thumbprint to Officer Pilger.  Shortly after the robbery, a truck matching the description of the getaway vehicle was involved in a traffic accident.  The defendant and Ramirez were arrested when they arrived at an address recorded in the accident report approximately three and a half hours after the robbery in a GMC Jimmy truck.  While Officer Pilger assisted in booking the defendant, he found approximately $419 in cash in the defendant's pockets, and a similar amount of cash on Ramirez.  Ramirez had a pistol in the waistband of his pants.  A black beanie hat and a pair of cut-up women's pantyhose were found in the truck.

17

18

19

20

21

Detective Filemon Zaragoza separately interviewed first Ramirez and then the defendant.  Detective Zaragoza told the defendant that Ramirez had confessed and identified the defendant as the one holding the gun.  The defendant denied any such participation.  The two suspects were then placed together in a holding cell while a video camera recorded their interaction. When Ramirez told the defendant that he had "snitched," the defendant responded, "we worked together, we got caught together, we're fucked together, we'll finish it together, fool."  They also discussed how the police might have identified them as the culprits.  And then stated, "[It's] like us walking in with full identity, [it's] just like us walking in with like armed burglary (inaudible) full identity, with our names, face, address card, everything."

22

23

24

25

26

27

Ramirez testified that he pled guilty to the robbery [of] the market and that the defendant was with Ramirez during the robbery.

28

2

1   People v. Elias, No. H023687, slip op. at 1-3 (Cal.Ct.App. July 29, 2003).

2                                   **DISCUSSION**

3        **A.    Standard of Review**

4        This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in

5   custody pursuant to the judgment of a State court only on the ground that he is in custody in

6   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

7   Rose v. Hodges,  423 U.S. 19, 21 (1975).

8        A district court may not grant a petition challenging a state conviction or sentence on

9   the basis of a claim that was reviewed on the merits in state court unless the state court's

10  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

11  unreasonable application of, clearly established Federal law, as determined by the Supreme

12  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

13  determination of the facts in light of the evidence presented in the State court proceeding."  28

14  U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 402-404, 409 (2000).[1]  Habeas relief is

15  warranted only if the constitutional error at issue had a "substantial and injurious effect or

16  influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001)

17  (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

18       **B.    Legal Claims**

19              **1.    Confrontation Clause**

20       At petitioner's trial, Detective Filomen Zaragoza ("Detective Zaragoza") testified that,

21  during his interview of petitioner, he told petitioner that Carlos Ramirez ("Ramirez") had

22  inculpated petitioner as a participant in the robbery and as the suspect who had used the gun.

23  Petitioner's counsel objected to the testimony as inadmissible hearsay, which objection was

24  overruled by the trial court.  Petitioner claims he is entitled to habeas relief because the

25  admission of this testimony violated his right under the Confrontation Clause of the Sixth

26  Amendment "to be confronted with the witnesses against him."  See U.S. Const., amend. VI.

27  _____

28       [1]A federal court must presume the correctness of the state court's factual findings.  28
    U.S.C. § 2254(e)(1).

                                        3

1    The California Court of Appeal held petitioner's right to confrontation was not violated,

2    based on the Supreme Court's decision in <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980).  Under

3    <u>Roberts</u>, the Confrontation Clause bars the admission of hearsay evidence in a criminal trial

4    unless the evidence (1) falls within a "firmly rooted hearsay exception" as dictated by the

5    applicable rules of evidence, or (2) bears "particularized guarantees of trustworthiness."  <u>See</u>

6    <u>id.</u> at 66.  The Court of Appeal agreed with the trial court that Detective Zaragoza's testimony

7    came within the "firmly rooted" hearsay exception for adoptive admissions.

8    Shortly before the instant petition was filed, however, the Supreme Court decided

9    <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), partially abrogating <u>Roberts</u>.  Although

10   petitioner's conviction became final almost five months before <u>Crawford</u> was decided, the

11   Ninth Circuit has held that <u>Crawford</u> applies retroactively to collateral attacks on state court

12   decisions.  <u>See</u> <u>Bockting v. Bayer</u>, 399 F.3d 1010, 1015-1016 (9th Cir. 2005).

13   Consequently, petitioner's claim must be reviewed <u>de novo</u> under <u>Crawford</u>.  <u>See</u> <u>id.</u>

14   Under <u>Crawford</u>, the Confrontation Clause bars the admission of out-of-court

15   statements of a "testimonial" nature unless (1) the declarant is unavailable to testify, and (2)

16   the defendant had a prior opportunity to cross-examine the declarant.  <u>See</u> <u>Crawford</u>, 541

17   U.S. at 59.  While expressly declining to give "testimonial" a comprehensive definition, the

18   Supreme Court held that the term "applies at a minimum to prior testimony at a preliminary

19   hearing, before a grand jury, or at a former trial; and to police interrogations."  <u>See</u> <u>id.</u> at 68.

20   Here, because Ramirez inculpated petitioner during questioning by the police, any such

21   statement by Ramirez would qualify as "testimonial" under <u>Crawford</u>.  Next, as discussed <u>infra</u>,

22   Ramirez was "unavailable" to testify as a witness with respect to petitioner's use of the gun.

23   Third, it is undisputed that petitioner lacked an opportunity to cross-examine Ramirez about

24   his statements to Detective Zaragoza at the time such statements were made.  Nevertheless,

25   the <u>Crawford</u> analysis is not complete at this point.

26   In particular, <u>Crawford</u> also held that the Confrontation Clause is not violated where (1) "the

27   declarant appears for cross-examination at trial" or (2) the testimonial statement at issue was

28   admitted "for purposes other than establishing the truth of the matter asserted."  <u>See</u> <u>id.</u> at 59

4

1    n. 9.

2        As to the first of these two exceptions, although Ramirez appeared as a witness at

3    petitioner's trial, he successfully asserted his Fifth Amendment privilege against self-

4    incrimination when asked whether petitioner used the gun during the robbery.  As a result,

5    Ramirez was, in essence, "unavailable" to testify as to that issue for purposes of the

6    Confrontation Clause.  See United States v. Wilmore, 381 F.3d 868, 871 (9th Cir. 2004)

7    (finding government witness's assertion of Fifth Amendment privilege as to prior statements

8    rendered witness "unavailable," leaving defendant with "no opportunity to 'confront'" witness as

9    to prior statements).  Consequently, the Court finds Ramirez did not "appear for cross-

10   examination at trial" with respect to the sole issue raised by the instant petition.

11       Respondent further argues, however, that the Crawford rule is inapplicable for the

12   additional reason that the challenged part of Detective Zaragoza's testimony was not admitted

13   for purposes of establishing the truth of Ramirez's statement to the police, but solely to prove

14   the fact that the statement was conveyed to petitioner, in order to establish an adoptive

15   admission.  As noted above, after Detective Zaragoza told petitioner that Ramirez had

16   inculpated him as the gunman, petitioner and Ramirez were placed in the same holding cell,

17   which was monitored by video and audio recording devices, and that a conversation ensued.

18   In that conversation, petitioner confronted Ramirez with what petitioner had been told by

19   Detective Zaragoza, and Ramirez conceded he had made the statements as reported.

20   Rather than denying the truth of those statements, however, petitioner simply responded by

21   telling Ramirez he should have invoked his right to remain silent.  At petitioner's trial, a

22   videotape of this conversation was admitted into evidence on the theory that, by failing to deny

23   Ramirez's accusations, petitioner had adopted them as petitioner's own admissions.

24       In Tennessee v. Street, 471 U.S. 409 (1985), on which respondent relies, a prosecution

25   witness was permitted to testify as to the confession of an accomplice, in order to rebut the

26   defendant's assertion that he had been coerced into repeating the accomplice's confession

27

28

5

as his own. <u>See id.</u> at 411-12.[2] The Supreme Court, noting the jury had been admonished that the confession "was admitted 'not for the purpose of proving its truthfulness but for the purpose of rebuttal only,'" <u>see id.</u> at 412, held the witness's testimony was not hearsay because it was admitted "not to prove what happened at the [ ] scene but to prove what happened when [the defendant] confessed, and, accordingly, the trial court's admission of the testimony "raise[d] no Confrontation Clause concerns," <u>see id.</u> at 414.

Here, likewise, the jury was advised as to the limited purpose for which it could consider the evidence challenged herein. Although the trial court did not admonish the jury at the time Detective Zaragoza's testimony was given, the trial court did give a detailed limiting instruction to the jury at the close of the case. Specifically, the jury was instructed pursuant to CALJIC 2.71.5 as follows:

> If you should find from the evidence that there was an occasion when the defendant (1) under conditions that reasonably afforded him an opportunity to reply; (2) failed to make a denial in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which this defendant now is on trial or tending to connect him with its commission; and (3) that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion be considered against him as indicating an admission that the accusation thus made was true. Evidence of an accusatory statement is not received for the purpose of proving its truth but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement.

(<u>See</u> CT at 152.) This instruction made clear that Detective Zaragoza's testimony was not admitted for the purpose of establishing the truth of Ramirez's statement to him. Additionally, the arguments of counsel for both parties made clear that Detective Zaragoza's testimony was introduced solely for the purpose of establishing an adoptive admission. On the subject of adoptive admissions, the prosecutor argued, in part:

> "You are going to hear instructions about what's called an adoptive admission. . .I will show it to you now[3]. . . . Adoptive

---

[2]The accomplice's confession differed from the defendant's in several particulars, including a more inculpatory description of the defendant's role in the crime. <u>See id.</u> at 412.

[3]It would appear that the prosecutor was using some type of projector to display the judge's instructions in written form to the jury.

> admission is basically a circumstance where somebody says
> something and you hear it and it's something bad about you. . . . In
> this case, you heard someone say or you heard that someone
> said you were the one holding the gun during the robbery.  You,
> France Elias.  Your friend, Carlos Ramirez said this about you."

(See RT at 233.)  Similarly, petitioner's trial counsel, in introducing his argument as to

adoptive admissions, stated:

> "An adoptive admission is a difficult thing because you are assuming a lot in that
> as well.  What you have got is somebody says something negative and the other
> person doesn't really respond to that.  And then we assume that means, well, he
> must be adopting a statement.  He must be admitting it.  Look carefully at the
> statement in this case that you have.  What they are talking about in some parts
> is what Carlos told the officer.

(See RT at 249.)

Given the trial court's explicit instructions, reinforced by the arguments of counsel, the

Court assumes that here, as in Street, the jury followed the instructions they received and did

not consider the subject testimony for the truth of the matters stated therein.  Consequently, the

Confrontation Clause is not implicated and there is no error under Crawford.  See Street, 471

U.S. at 414-15.

Further, assuming, arguendo, the testimony comes within the Crawford rule, petitioner

nonetheless is not entitled to habeas relief, because the admission of Detective Zaragoza's

testimony did not have "a substantial and injurious effect or influence in determining the jury's

verdict."  See Brecht, 507 U.S. at 637-638.

As set forth above, the jury viewed a videotape of the conversation between petitioner

and Ramirez at the time the two suspects were housed together in the holding cell.  From that

evidence alone, the jury was fully aware that Ramirez had inculpated petitioner during his

interview with Detective Zaragoza.  At the outset of their videotaped conversation, petitioner

informed Ramirez: "[T]hey told me that you snitched . . . you gave everything out, you . . . told

them that I had the gun"; Ramirez responded: "I told."  (See CT Exh. 1b at 118.)  Indeed, the

entire conversation essentially concerns the fact that Ramirez had spoken to the police and

had inculpated both himself and petitioner, which, as petitioner observed, was not prudent and

left them few, if any, desirable options.  (See id. at 118-21) Given the jury's viewing of the

7

1    videotape of this conversation, Detective Zaragoza's testimony that he told petitioner Ramirez

2    had inculpated him was, in essence, cumulative and, in any event, undisputed.  See United

3    States v. Nielsen, 371 U.S. 574, 581 (2004) (noting evaluation of prejudice includes

4    consideration of "whether the evidence was cumulative" as well as "the presence of

5    corroborating evidence").

6         In addition, the prosecution's case as to petitioner's use of the gun was strong.  See id.

7    (noting evaluation of prejudice includes "the overall strength of the prosecution's case").

8    Edwin Lin ("Lin"), the victim of the robbery, positively identified petitioner at trial as the

9    individual who used the gun during the robbery.  Although, as petitioner notes, "[t]he vagaries

10   of eye witness identification are well-known," see United States v. Wade, 388 U.S. 218, 228

11   (1967), Lin's personal familiarity with Ramirez, who was a frequent patron of Lin's check-

12   cashing business, made him a particularly credible witness.  Because Lin recognized

13   Ramirez, he had no difficulty distinguishing the two suspects. Moreover, Lin's testimony that

14   petitioner stayed on the far side of the counter, holding the gun on Lin, is consistent with Lin's

15   testimony that Ramirez was the suspect who came behind the counter, grabbed the money

16   from the cash register and stuffed it into his pockets.[4]

17        Further, Lin's account was corroborated by the videotape of petitioner's jailhouse

18   conversation with Ramirez, during which petitioner expressed no disagreement with the

19   accuracy of Ramirez's statement to the police, a statement wherein Ramirez identified

20   petitioner as the suspect with the gun.  Instead, immediately after Ramirez informed petitioner

21   he had inculpated petitioner as the suspect with the gun, petitioner proceeded to counsel

22   Ramirez as to his legal rights:

23        [Y]ou should have told them nothing.  You should have just told them, hey, my
          right is to have a lawyer, so I have nothing to tell you, because they tell you, you
24        have the right to remain silent.

25   (See CT Ex. 1b at 118.)  Indeed, later in the conversation, petitioner appears to explicitly

26

27        [4]Petitioner points out that Ramirez was in possession of the gun at the time the two
     suspects were apprehended by the police.  Given the time that elapsed between robbery and
28   arrest, however, the gun easily could have changed hands.

1   admit to using the gun:

2          [Petitioner]:  It's my fault homes.

3          [Ramirez]:  How's it your fault?  (Inaudible) you tried to help me.

4          . . .

5          [Petitioner]:  [T]hey not gonna write, oh he was there to help him, they gonna
           write, yeah – he was with him in the scene.  He was he was the one that was holding the
6          gun, they not gonna say, oh, he did that because he was helping him, oh plus
           France doesn't need no money, he just did, they not gonna see that bro.

7   (See id. at 120.)

8          Given that Detective Zaragoza's testimony as to what he told petitioner about

9   Ramirez's statement was cumulative, that the testimony was corroborated by other evidence,

10  and that the prosecution's case against petitioner was exceptionally strong, petitioner has not

11  shown that the evidence had a "substantial and injurious effect or influence in determining the

12  jury's verdict.  See Brecht, 507 U.S. at 637.

13         2.     Due Process

14         As discussed above, Detective Zaragoza, after informing petitioner that Ramirez had

15  inculpated him, placed the two suspects in the same holding cell; their conversation was

16  recorded on videotape; and the videotape was played for the jury at trial.  Petitioner claims

17  that because Detective Zaragoza withheld from him the fact that his statements would be

18  recorded, the admission of the videotape at trial rendered the trial "fundamentally unfair," in

19  violation of his right to due process under the Fifth and Fourteenth Amendments.  See Henry v.

20  Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).

21         Petitioner correctly concedes that the videotaping of his conversation with Ramirez

22  violated neither his Fifth Amendment right against self-incrimination, see Illinois v. Perkins,

23  496 U.S. 292, 296 (1990) (holding right against self-incrimination not implicated when

24  incriminating statements elicited by civilian rather than police agent)[5], nor his Sixth

25  Amendment right to counsel, see Brewer v. Williams, 430 U.S. 387, 398 (1977) (holding right

26

27         [5]Ramirez was not a police agent.  Detective Zaragoza did not ask Ramirez to elicit
    incriminating statements from petitioner nor did he in any other fashion suggest that Ramirez
28  conduct himself in any particular manner.

                                           9

1   to counsel does not attach until formal charges have been lodged).  Nevertheless, he argues,

2   given "the underlying rational[e] of the Fifth and Sixth Amendment cases," his rights were

3   violated to such a degree as to render his trial fundamentally unfair.  (See Petn. at 14.)

4          Petitioner has provided no authority, and the Court has located none, in support of this

5   claim.  Rather, the Supreme Court has held that "coercive police activity is a necessary

6   predicate to the finding that a confession is not 'voluntary' within the meaning of the Due

7   Process Clause. . . ."  See Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Such

8   coerciveness has only been found in cases involving police misconduct so extreme as to

9   implicate fundamental rights rooted in the "traditions and conscience of our people," see

10  Moran v. Burbine, 475 U.S. 412, 432 (1986) (quoting Rochin v. People of California, 342 U.S.

11  165, 169 (1952)), such as the imposition of extreme physical and/or mental duress, see, e.g.,

12  Colorado v. Connelly, 479 U.S. at 164 n.1 (collecting cases).

13         In Moran v. Burbine, for example, the Supreme Court held that a deliberate failure on

14  the part of the police to inform a suspect under interrogation that his attorney was trying to

15  reach him, while assuring the attorney that his client would not be interrogated, fell "short of the

16  kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal

17  intrusion into the criminal process."  See Moran v. Burbine, 475 U.S. at 433-434.  Here, there

18  was no misrepresentation or coercive conduct of any kind, and, contrary to petitioner's

19  argument, it is not within the discretion of this Court to rule that "what the Officers did was

20  simply wrong."  (See Petn. at 19 (emphasis omitted).)[6]

21  _____

22      [6]Although petitioner has not raised the argument, the Court further concludes that
     Detective Zaragoza's conduct did not violate petitioner's Fourth Amendment right to privacy.
23   "The Fourth Amendment is not triggered unless the state intrudes into an area 'in which there
     is a constitutionally protected reasonable expectation of privacy.'"  See United States v. Van
24   Poyck, 77 F.3d 285, 290 (9th Cir. 1996) (quoting New York v. Class, 475 U.S. 106, 112
     (1986)).  "Such a constitutionally protected reasonable expectation of privacy exists only if (1)
25   the defendant has an 'actual subjective expectation of privacy' in the place searched and (2)
     society is objectively prepared to recognize that expectation."  See id. (quoting United States
26   v. Davis, 932 F.2d 752, 756 (9th Cir. 1991).
         Pretrial detainees, to the same extent as convicted prisoners, have a "severely
27   curtailed" expectation of privacy within jailhouse walls.  See id. at 291 and n. 10 (citing Bell v.
     Wolfish, 441 U.S. 520, 546 (1979)).  In Lanza v. New York, 370 U.S. 139, 143 (1962), the
28   Supreme Court held the Fourth Amendment was not triggered by the taping of a prisoner's
     statements in a jail visiting room, noting that, "[i]n prison, official surveillance has traditionally

1

**CONCLUSION**

2          In light of the foregoing, the petition for a writ of habeas corpus is hereby DENIED.

3   As the claims were adequately presented in the petition and traverse, the interests of justice

4   did not necessitate the appointment of counsel in this matter, and, accordingly, petitioner's

5   request for appointment of counsel is DENIED.

6          The Clerk shall close the file and terminate any pending motions.

7          **IT IS SO ORDERED.**

8   Dated: September 6, 2005

9                                                            MAXINE M. CHESNEY
                                                            United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   been the order of the day."  Similarly, in <u>Van Poyck</u>, the Ninth Circuit held that "any expectation
     of privacy in outbound [telephone] calls from prison is not objectively reasonable and . . . the
27   Fourth Amendment is therefore not triggered by the routine taping of such calls."  <u>See</u> <u>Van</u>
     <u>Poyck</u>, 77 F.3d at 291; <u>see</u> <u>also</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 526 (1984) (finding
28   prisoner has no reasonable expectation of privacy in jail cell).

11